[Civ. No. 25734.   First Dist., Div. Two.   May 28, 1969.]

DEBORAH DICKEY KIRK, Plaintiff and Appellant, v.
THE BOARD OF REGENTS OF THE UNIVERSITY
OF CALIFORNIA, Defendant and Respondent.

Charles R. B. Kirk for Plaintiff and Appellant.

Thomas J. Cunningham and Aletha R. Titmus for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Jan Stevens and Elizabeth Palmer, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Respondent.

TAYLOR, J.—Petitioner, Deborah D. Kirk, appeals from a judgment of dismissal entered on an order sustaining the demurrer of respondent, The Board of Regents of the University of California (hereafter referred to as The Regents), to her petition for a writ of mandate demanding her reclassi-

fication from a "nonresident" to a "resident" student. She contends that as the wife of a resident, she qualifies as a "resident student" and is being deprived of certain constitutional rights because in the fall of 1967, she was charged a nonresident rather than a resident tuition fee, pursuant to a requirement that a person must have been a bona fide resident of the state for more than one year immediately preceding the opening day of the semester in question. The case is one of first impression.[1]

The facts were stipulated as follows: On July 1, 1967, petitioner, then a resident of Ohio, married Charles R. B. Kirk, a resident of the State of California since June 23, 1966. She arrived in California with her husband on July 13, 1967, presently lives with him in Berkeley, California, and has stated her intent to continue to cohabit with her husband and to be and remain a California resident. In the fall of 1967, petitioner enrolled as a student at the University of California, was classified as a "nonresident" student, and paid, on September 26, 1967, tuition of $324 more per quarter than persons classified as resident students. Her husband paid California income taxes for the 1966 tax year, is a member of the State Bar of California, and has been employed by the office of the Attorney General since August 29, 1966.

The classification of petitioner as a nonresident was made pursuant to The Regents' Standing Orders, chapter VI section 8(b), which provides, so far as pertinent: "[T]he residence of each student shall be determined in general accordance with the rules for determining residence prescribed by the provisions of Sections 23054, 23055, 23057 and 23059 of the Education Code and Sections 243 and 244 of the Government Code of California, . . ."

Education Code section 23054 provides, so far as pertinent: "'A resident student' means *any person who has been a bona fide resident of the State for more than one year immediately preceding the opening day of a semester during which he proposes to attend the university.*

*"The residence of each student shall be determined in accordance with the rules for determining residence prescribed by Sections 243 and 244 of the Government Code.*

---

[1]Because of the importance of the issues presented, this court permitted the Trustees of the California State Colleges (hereafter Trustees), who are in a position identical to The Regents and have identical durational residence requirements, to file an amicus curiae brief in this appeal. Accordingly, we have hereafter used the term "durational residence requirement" to refer to the respective residence requirements of the University of California and the State Colleges.

"…  .  .  .  .  .  .  .  .  .  .

"(b) *Any person who qualifies for residence status . . . under Sections 243 and 244 of the Government Code shall not lose such residence status by virtue of his marriage to a nonresident who lives in California* nor shall such person be required to reestablish residency upon reaching his or her majority." (Italics added.)[2]

Section 243 of the Government Code provides: "Every person has, in law, a residence."

Section 244 of the Government Code provides, so far as pertinent: "In determining the place of residence the following rules are to be observed:

"(a) It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose.

"(b) There can only be one residence.

"(c) A residence cannot be lost until another is gained.

"…  .  .  .  .  .  .  .  .  .  .

"(e) *The residence of the husband is the residence of the wife,* provided that a married woman who is separated from her husband may establish her own residence. [Italics added.]

"…  .  .  .  .  .  .  .  .  .  .

"(g) The residence can be changed only by the union of act and intent."

██ As we recently pointed out in *Whittell* v. *Franchise Tax Board,* 231 Cal.App.2d 278, 284 [41 Cal.Rptr. 673], with reference to Government Code sections 243 and 244, despite the fact that the terms residence and domicile[3] are often used synonymously, residence is not a synonym for domicile, and

---

[2]The provisions that affect the Trustees are respectively: Education Code section 23756, which provides, so far as pertinent: " 'A resident student' means any person who has been a bona fide resident of the state for more than one year immediately preceding the *residence determination date.*

"…  .  .  .  .  .  .  .  .  .  .

"(b) Any person who qualifies for residence status under subdivision (a) of this section or under Sections 243 and 244 of the Government Code shall not lose such residence status by virtue of his marriage to a nonresident who lives in California nor shall such person be required to reestablish residency upon reaching his or her majority."

Education Code section 23758.1: "The resident status of a California resident shall not, for the purpose of any state college admission fee or rate of tuition, be affected by the marriage of such person to a nonresident."

[3]We distinguish between "domicile" as the one location with which, for legal purposes, a person is considered to have the most settled and permanent connection, where he intends to remain and return to, as distinct from his "residence" which denotes any factual place of abode of some permanency.

its meaning in particular statutes is subject to differing construction, depending on the context and purpose of the statute in which it is used. The parties agree that in the applicable sections of the Education Code, as in the Government Code sections therein cited, the term is used to mean domicile. In construing former Political Code section 1394½ (the predecessor of the pertinent portions of Education Code section 23054), in *Bryan* v. *Regents of the University of Cal.*, 188 Cal. 559 [206 P. 1071],[4] our Supreme Court held that the purpose of the statute was to ascertain the good faith of a person's intention to remain a permanent resident of the state and that he was not temporarily residing within the state for the mere purpose of securing the advantages of the university.

■ Preliminarily, we turn to petitioner's argument that she qualifies as a ''resident'' student, because she became a resident of California by operation of law by her marriage to a California resident on July 1, 1967. She contends that she should be allowed to take advantage of her husband's period of residence (June 23, 1966 to July 1, 1967) prior to the marriage and, therefore, be classified as a resident for one year preceding the first day of the fall semester of 1967.

Petitioner first argues that since her residence, like that of a minor, is derivative, she should be allowed the same privileges as are made specifically available by the statute to minors.[5]

---

[4] In Bryan, the court upheld the constitutionality of the statute under the uniform laws, privileges and immunities provisions (art. I, §§ 11 and 21, respectively) of the state Constitution, as between residents and non-residents. As petitioner here is a resident, Bryan is not otherwise helpful. Furthermore, we think the portion of its reasoning that it would be impossible for the state university to provide educational opportunities for all of the citizens of the state is outdated.

[5] For example, subdivisions (a) and (c) of Education Code section 23054 provide: ''(a) Where immediately prior to first entering any California institution of higher learning the minor child has lived with and been in the continuous direct care and control of any person or persons other than a parent for a period of not less than two years, the residence of the minor child is the residence of the person or persons having such care and control after the expiration of that two years. As used in this subdivision, 'California institution of higher learning' means any public or private university, college, or junior college in the State.''

''(c) Any minor child, a citizen of the United States, or any alien, who is a minor child, who has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of the laws of the United States, who does not receive and has not for a period of more than one year immediately preceding the opening day of a semester during which he proposes to attend the university received, directly or indirectly, any support or financial assistance from his father, if the minor lives with his mother, who is and has been for a period of more than one year immediately preceding the opening day of the

Petitioner's contention overlooks the fact that a minor is not capable of establishing his residence and his residence at all times is derived from that of his parent, guardian or person with whom he resides. Petitioner, on the other hand, prior to her marriage and as a single adult, was capable of and had established a residence in Ohio. Thus, while a minor does not have a legal residence separate and apart from his parent (Gov. Code, § 244, subd. (d)), petitioner, until her marriage, had a separate and distinct residence. Both a minor child and a married woman are treated equally in that the person from whom they derived their residence status may establish the legal residence of the child or married woman, regardless of their physical presence or intent. When petitioner married a California resident, she became a California resident from the date of the marriage, in spite of the fact that she was not physically present in California. However, it does not logically follow from this fact that for tuition purposes, petitioner should be allowed to retroactively take advantage of the period of her husband's residence prior to the marriage, and be classified as a resident student.

Petitioner has not cited a single instance where the residence of a husband prior to the marriage was retroactively "tacked" onto that of the wife in order to meet a residence requirement. The parties appear to glean this conclusion from the brief discussion in 16 Ops.Cal.Atty.Gen. 142, 143, which construed former Elections Code section 5660,[6] which then provided that the residence of the husband was the residence of the wife except where the husband lives apart from the family.

Although the Attorney General's opinion is very brief and not totally illuminating, his interpretation of the Elections Code provision (which contains language substantially identical to the language of the Government and Education Codes provisions here in issue), simply means that regardless of the physical whereabouts of a wife who is not separated and living apart from her husband, one year after the date of the

semester actually present in the State with the intention of making her permanent home therein, is a resident student."

[6]This provision is now Elections Code section 14290, which provides, so far as pertinent: "The residence of the husband is the residence of the wife except as provided in Sections 14289 . . ."

Elections Code section 14289: "If a man has a family fixed in one place, and he does business in another, the former is his place of residence; but any man having a family, who has taken up his abode with the intention of remaining and whose family does not so reside with him, is a resident where he has so taken up his abode."

marriage (on which the wife acquires her husband's residence), she becomes a resident of the state or county for purposes of voting in elections.[7] In each of the instances discussed in the Attorney General's opinion, the parties had been married for a year or more and also had the other qualifications for voting. We find nothing in that opinion nor in any other authority that permits the retroactive "tacking" of the husband's period of residence preceding the marriage. We think that in the instant case, one year after the date of the marriage (July 1, 1968), petitioner had been a resident of the state for a full year. In the fall of 1967, when petitioner enrolled at the university, she had only been a resident of the state for several months, and had not met the requirement of The Regents' Standing Orders, chapter VI, section 8(b) of having been a bona fide resident of the state for one year immediately preceding the date on which she first entered the university.

We turn then to the main contention on appeal concerning the constitutionality of the one-year durational residence requirement and the pertinent code sections. Petitioner contends that: the requirement was an unconstitutional interference with her fundamental constitutional right of interstate travel; no compelling governmental interest justifies this clear violation of the equal protection clause; and the requirement is unconstitutionally vague and uncertain. She argues that all of these questions have been conclusively determined in her favor in *Shapiro* v. *Thompson,* 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322], and its two companion cases, decided by the U. S. Supreme Court on April 21, 1969.

In *Shapiro* and the companion cases, the U. S. Supreme Court affirmed judgments holding unconstitutional state and District of Columbia provisions that denied welfare assistance to persons who had not resided within the jurisdiction for at least one year preceding the application for such assistance. In so doing, the court stated (at p. 627 [22 L.Ed.2d at p. 611]) that the effect of the waiting period requirement in each case was to create two classes of needy resident families indistinguishable from each other, except that one was com-

[7]The residence qualifications for elections are set forth in article II, section 1 of the state Constitution: "Every native citizen of the United States of America, . . . and every naturalized citizen thereof, who shall have become such 90 days prior to any election, of the age of 21 years, who shall have a residence of the State one year next preceding the day of election, and of the county in which he or she claims his or her vote 90 days, and in the election precinct 54 days, shall be entitled to vote at all elections . . ."

posed of residents who had resided in the jurisdiction for a year or more and the second of residents who had resided less than a year in the jurisdiction. The court found that the second classification constituted an invidious distinction between classes of citizens, and continued at page 633: "We recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State *may not accomplish such a purpose by invidious distinctions between classes of its citizens.* It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot be an independent ground for an invidious classification.

"In sum, neither deterrence of indigents from migrating to the State nor limitation of welfare benefits to those regarded as contributing to the State is a constitutionally permissible state objective." (Italics added.)

The court noted that since the second classification touched on the fundamental right of interstate movement, its constitutionality must be judged not by the traditional equal protection standard of reasonable relation to a legitimate governmental objective but by the standard of whether a compelling governmental interest was promoted. The court then rejected as compelling state interests and valid governmental objectives: the fiscal integrity of state public assistance programs; the contribution made to the community through the payment of taxes; budget planning and predictability; administrative efficiency in determining residency by an objective standard; the need to safeguard against fraudulent receipt of benefits; and encouraging new entrants to seek employment.

The court held at page 638: "We conclude therefore that appellants in these cases *do not use and have no need to use* the one-year requirement for the governmental purposes suggested. Thus, even under traditional equal protection tests a classification of welfare applicants according to whether they have lived in the State for one year would seem irrational and unconstitutional. But, of course, the traditional criteria do not apply in these cases. Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest. Under this standard,

the waiting period requirement clearly violates the Equal Protection Clause.[21]'' (Italics partially added.)

Were there only this language in the opinion, we would agree with petitioner. Significantly, however, to the language quoted above, the court appended footnote 21 as follows: *"We imply no view of the validity of waiting period or residence requirements determining* eligibility to vote, *eligibility for tuition-free education,* to obtain a license to practice a profession, to hunt or fish, and so forth. *Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel."* (Italics partially supplied.)

We do not think the addition of this footnote was an idle act to indicate the obvious fact that the opinion dealt merely with the questions presented. Rather, we read the footnote to mean that the court did not necessarily intend to apply the same standards to other residence requirements like the one here in question.[8]

■ Therefore, we turn next to petitioner's contention that the durational residence requirement here in issue has an unconstitutional "chilling effect" on her fundamental constitutional right of interstate travel, by conditioning the exercise of that right upon her ability to pay the higher nonresident tuition rate at the university.

[8]We note that the dissenting opinion of the Chief Justice commented on footnote 21 as follows, at page 654: "Nor can I understand the Court's implication in footnote 21, *ante,* that other state residence requirements such as those employed in determining eligibility to vote do not present constitutional questions. Despite the fact that in *Drueding* v. *Devlin* (1964) 380 U.S. 125 [13 L.Ed.2d 792, 85 S.Ct. 807], we affirmed an appeal from a three-judge District Court after the District Court had rejected a constitutional challenge to Maryland's one-year residence requirement for presidential elections, the rationale employed by the Court in these appeals would seem to require the opposite conclusion. If a State would violate equal protection by denying welfare benefits to those who have recently moved interstate, then it would appear to follow that equal protection would also be denied by depriving those who have recently moved interstate of the fundamental right to vote. There is nothing in the opinion of the Court to explain this dichotomy. In any event, since the constitutionality of a state residence requirement as applied to a presidential election is raised in a case now pending *Hall* v. *Beals, No. 950,* 1968 Term, I would await that case for a resolution of the validity of state voting residence requirements.

". . . . . . . . . .

"The Court's decision reveals only the top of the iceberg. Lurking beneath are the multitude of situations in which States have imposed residence requirements including eligibility to vote, to engage in certain professions or occupations or to attend a state-supported university. Although the Court takes pains to avoid acknowledging the ramifications of its decision, its implications cannot be ignored. I dissent."

Carrying petitioner's argument to its logical conclusion, the consequence of the durational residence requirement is that persons like herself who contemplate marriage and interstate changes of residence to accompany their spouses, take into account the fact that if they intend to continue their pursuit of higher education, they will have to pay the higher nonresident tuition fee at publicly financed institutions for a maximum period of one year. A restatement of this argument in another way indicates how farfetched and unreasonable it is. Thus, it seems absurd to contend that a person would marry a resident of this state in order to obtain one year of higher education at a lower cost. We conclude that the particular requirement here in issue does not deter any appreciable number of persons from marrying California residents[9] or moving into the state.[10]

While we fully recognize the value of higher education,[11] we cannot equate its attainment with food, clothing and shelter. *Shapiro* involved the immediate and pressing need for preservation of life and health of persons unable to live without public assistance, and their dependent children. Thus, the residence requirements in *Shapiro* could cause great suffering and even loss of life. The durational residence requirement for attendance at publicly financed institutions of higher learning do not involve similar risks. Nor was petitioner (unlike the families in *Shapiro*) precluded from the benefit of obtaining higher education. Charging higher tuition fees to nonresident students cannot be equated with granting of basic subsistence to one class of needy residents while denying it to an equally needy class of residents.

The authorities cited by petitioner are not pertinent. *Aptheker* v. *Rusk*, 378 U.S. 500 [12 L.Ed.2d 992, 84 S.Ct. 1659], and *Kent* v. *Dulles*, 357 U.S. 116 [2 L.Ed.2d 1204, 78 S.Ct. 1113], were concerned with absolute proscriptions on movement. The charged conspiracy in *United States* v. *Guest*, 383 U.S. 745 [16 L.Ed.2d 239, 86 S.Ct. 1170], and the statute in *Edwards* v. *California*, 314 U.S. 160 [86 L.Ed. 119, 62 S.Ct. 164], intentionally and purposely discouraged interstate travel. In *Sherbert* v. *Verner*, 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790], South Carolina's application of its unemploy-

---

[9] If so, there would be an additional infringement on the right to marry.

[10] The ever-increasing population of this state suggests the contrary.

[11] We have held that attendance at a publicly financed institution of higher learning is a benefit somewhat analogous to public employment (*Goldberg* v. *Regents of the University of Cal.*, 248 Cal.App.2d 867, 877 [57 Cal.Rptr. 463]).

ment compensation act constrained a worker to abandon his religious conviction concerning the day of rest, and constituted a permanent infringement of a First Amendment freedom.

■ As we have concluded that the durational residence requirement here in issue does not infringe on petitioner's fundamental right to travel, it should be judged by ordinary equal protection standards.[12] The applicable criteria are familiar and well established. ■ A legislative measure will be found to deny equal protection only if "it is without any reasonable basis and therefore is purely arbitrary." (*Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61, 78 [55 L.Ed. 369, 377, 31 S.Ct. 337].) It is not enough that the measure results incidentally "in some inequality," or that it is not drawn "with mathematical nicety"; the statutory classification must instead cause "different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." (*Walters* v. *City of St. Louis*, 347 U.S. 231, 237 [98 L.Ed. 660, 665, 74 S.Ct. 505].)

■ Thus, any classification by a state that is not palpably arbitrary and is reasonably based on a substantial difference or distinction is not a violation of the equal protection clause so long as the classification is rationally related to a legitimate state objective or purpose. In this instance, then, we must determine whether the classification of students as residents or nonresidents for the purpose of paying tuition is reasonable and whether that classification is rationally related to a legitimate objective of the State of California.

Petitioner relies on *Newman* v. *Graham* (1960) 82 Idaho 90 [349 P.2d 716, 83 A.L.R.2d 492], and *Carrington* v. *Rash*, 380 U.S. 89 [13 L.Ed.2d 675, 85 S.Ct. 775], to argue that the durational residence requirement is as arbitrary, unreasonable, and absolute as the residence requirements of the cited cases. We cannot agree.

In *Newman*, the regulation provided that one who, for tuition fee purposes, was properly classified as a nonresident student when first enrolled at the college, retained such status throughout the period of his continuous attendance. The stipulated facts there indicated that at the time of the plain-

---

[12]We cannot accept the portion of the *Shapiro* opinion (quoted *ante*, pp. 438-439) concerning the irrationality and unconstitutionality of the welfare residence requirements, under the traditional equal protection criteria, as a conclusive indication that the durational residence requirement here in issue is equally irrational and unconstitutional under the traditional test.

tiff's enrollment for the second year, he had been, for the required six months' period, a resident of and domiciled in the state but he was nevertheless forced to pay nonresident tuition fees. The court held that accordingly, the regulation was capricious and unreasonable in denying equality to persons of the same class.

In *Carrington,* the U.S. Supreme Court struck down a similarly absolute Texas constitutional provision that prohibited any member of the Armed Forces of the United States who moved his home to Texas during the course of his military duty from ever voting in Texas as long as he was a member of the Armed Forces. The court stressed (at pp. 95-96 [13 L.Ed.2d at pp. 679-680]) the fact that Texas had singled out servicemen without applying the same rule to other groups whose bona fide residence might be in doubt (such as students at colleges and universities) who were given an opportunity to show election officials that they were bona fide residents. The court, however, said at page 91: ''Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot,'' and that ''There can be no doubt either of the historic function of the States to establish, on a nondiscriminatory basis, and in accordance with the Constitution, other qualifications for the exercise of the franchise.'' Similarly, it can be argued that the benefit of attending a publicly financed institution of higher education in this state, is within the jurisdiction of the state, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals in violation of the Constitution.

We find most persuasive *Clarke* v. *Redeker* (S.D. Iowa 1966) 259 F.Supp. 117. In that case, a male student at the time he entered the State University of Iowa in 1961, was a minor, continued to attend the university until after his majority, and married an Iowa resident. The Iowa regulations there in issue were more or less the converse of the durational residence requirement here in issue, in that a nonresident female student could attain residence through marriage to a resident and a resident female student could lose her residence through marriage to a nonresident. The plaintiff there, like petitioner here, relied heavily on *Carrington* v. *Rash, supra.* The court in *Clarke* noted that while the *Carrington* case was helpful, it was not dispositive of the issues before it, as the Iowa tuition regulations did not establish absolute or unalterable classifications, and went on to say that while it might be reasonable for the state university to classify both

husband and wife as residents of the same state, whenever a resident married a nonresident, it was not necessarily required to do so for tuition purposes. The court indicated that the marriage of a resident and nonresident should merely be a factor in determining the residence classification, and noted that the regulations pertained only to female students but made no reference to the marriage of male students. The court, however, indicated that the regulation did not require reclassification of the female student but merely served as a guideline for possible reclassification. The court pointed out that the lack of a similar guideline for male students involved in a marriage to a resident did not prevent the university officials from considering the fact of marriage when a male student attempted to overcome the rebuttable presumption of nonresidence. Thus, the court indicated that the university regulations did not constitute a constitutional violation but reversed the case as it appeared that the plaintiff had actually established a substantial basis, independent of his marriage, for being classified as a resident for tuition payment purposes.

█ Similarly here, the durational residence requirement is not set up in terms of an absolute classification. A student from another state, like petitioner, is classified as a nonresident because he is presumed to be in California primarily for educational purposes. If appropriate facts and circumstances arise subsequent to a student's classification as a nonresident, there is nothing in the regulation that would prevent petitioner's reclassification as a resident. She is merely required to present sufficient evidence to overcome the presumption of nonresidence. There is here, unlike *Newman* and *Carrington*, no arbitrary permanent classification of nonresidency which prohibits her from subsequently proving that she does, in fact, qualify for resident tuition. Furthermore, just as petitioner did not automatically acquire resident student status by her marriage, a person who qualifies as a resident student does not lose such status by virtue of marriage to a nonresident who lives in California. We conclude that the durational residence requirement here, as in *Clarke, supra,* was reasonable.

We turn then to the question of whether the classification of petitioner as a nonresident student was reasonably related to a legitimate objective of the State of California.

█ The Regents and the Trustees justify the higher tuition fees paid by persons like petitioner who are classified as

nonresidents, primarily on the basis that resident students (or their parents) pay taxes to the State of California which, in turn, supports and maintains the university. The higher tuition charged nonresident students tends to distribute more evenly the cost of operating and supporting the University of California between residents and nonresidents attending the university. Although there is no way for this court to determine the degree to which the higher tuition charge equalizes the educational cost of residents and nonresidents, it appears to be a reasonable attempt to achieve a partial cost equalization by collecting lower tuition fees from those persons who, directly or indirectly, have recently made some contribution to the economy of the state through having been employed, having paid taxes, or having spent money in the state for the brief period of one year prior to their attendance at a publicly financed institution of higher education.

Thus, as we read *Shapiro* v. *Thompson*, while the payment of taxes, fiscal integrity and budgetary planning[13] are expressly rejected either as "traditional equal protection tests" or as "compelling state interests" that justify the imposition of benefits essential to life and health, they may well be reasonably related to legitimate objectives of the State of California for the purpose of imposing residence conditions on attendance at a university or state college.

This state has a valid interest in providing tuition-free education to those who have demonstrated by a year's residence a bona fide intention of remaining here and who, by reason of that education, will be prepared to make a greater contribution to the state's economy and future. Accordingly, we hold that the regulation classifying students as residents or nonresidents for tuition purposes is not arbitrary or unreasonable and bears a rational limitation to California's objective and purpose of financing, operating and maintaining its many publicly financed educational institutions of higher learning (*Bryan* v. *Regents of the University of Cal.*, 188 Cal. 559 [205 P. 1071]; *Clarke* v. *Redeker, supra*).

█ Residents and nonresidents can be treated differently where there are valid reasons for doing so (*Toomer* v. *Witsell*, 334 U.S. 385 [93 L.Ed. 1460, 68 S.Ct. 1157]), and the privileges and immunities clause does not guarantee to peti-

---

[13]In so doing, we deliberately omit two other governmental purposes mentioned in *Shapiro,* the prevention of fraud and administrative convenience. We reject the first as too farfetched under the facts here presented; and the second, as neither The Regents nor the Trustees have seriously suggested it as a basis.

tioner the right to attend the university for the same fee as that charged to persons who have met the one-year residence requirement (cf. *American Commuters Assn.* v. *Levitt* (S.D. N.Y. 1967) 279 F.Supp. 40, 47).

Finally, we do not think petitioner has shown that the one-year residence requirement is constitutionally vague and uncertain, either on its face, or as applied to her.

Affirmed.

Shoemaker, P. J., and Agee, J., concurred.

On July 7, 1969, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied August 13, 1969.