(No. 46946

THE PEOPLE *ex rel.* KENNETH W. HOLLAND, Director of Labor, Appellant, v. BLEIGH CONSTRUCTION COMPANY, Appellee.

*Opinion filed September 26, 1975.*

William J. Scott, Attorney General, of Chicago (Paul J. Bargiel and Ann Plunkett Sheldon, Assistant Attorneys General, of counsel), for appellant.

Schmiedeskamp, Robertson, House, Heu & Mitchell, of Quincy, for appellee.

William C. Cavanagh and James L. Magill, both of Springfield, for *amicus curiae* Illinois State Council of Operating Engineers.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Kenneth W. Holland, Director of Labor, filed this action in the circuit court of Adams County seeking to permanently enjoin defendant Bleigh Construction Company, a Missouri corporation, from "continuing to carry on public works projects construction in Adams County" for the reason that defendant failed to employ Illinois laborers as required by the "Preference to Citizens on Public Works Projects" Act (Ill. Rev. Stat. 1973, ch. 48, pars. 269 through 275). Defendant moved to dismiss and the circuit court, holding the statute unconstitutional, allowed the motion and dismissed the case. Pursuant to Supreme Court Rule 302(a) plaintiff appeals directly to this court.

Section 3 (ch. 48, par. 271) of the Preference Act provides:

"Every person who is charged with the duty, either by law or contract, of constructing or building any public works project or improvement for the State of Illinois or any political subdivision, municipal corporation or other

governmental unit thereof shall employ only Illinois laborers on such project or improvement, and every contract let by any such person shall contain a provision requiring that such labor be used: Provided, that other laborers may be used when Illinois laborers as defined in this Act are not available, or are incapable of performing the particular type of work involved, if so certified by the contractor and approved by the contracting officer."

Section 1 (par. 269) of the Act provides:

"A person shall be deemed to be an Illinois laborer if he is a citizen of the United States or has received his first naturalization papers and has resided in Illinois for at least one year immediately preceding his employment."

The complaint alleged that defendant employed Missouri citizens on public works construction projects in Adams County in violation of section 3 of the Act. The "public works construction projects" involved the construction of public school buildings. Defendant moved to dismiss on the grounds that the Act is in conflict with Title VII of the Federal Civil Rights Act of 1964 (42 U.S.C. sec. 2000e *et seq.*) and with the provisions and intent of the Illinois Fair Employment Practices Act (Ill. Rev. Stat. 1973, ch. 48, pars. 851 through 865), and that the quoted statutory sections contravene the due process and equal protection clauses of the Federal and Illinois constitutions, the privileges and immunities clause and the commerce clause of the Federal Constitution, and the inherent and inalienable rights provision of the Illinois Constitution.

Plaintiff contends that the defendant lacks standing to challenge the validity of the Act. Citing *People v. Palkes*, 52 Ill.2d 472, he argues that "The defendant employer in this case is not a proper party to represent the alleged constitutional rights of a class of laborers who are not Illinois citizens since it is not a member of that class." We do not agree. Defendant obviously has standing to challenge the validity of the statute upon which the action against it is based.

Plaintiff contends next that defendant should be

estopped from attacking the constitutionality of the statute. He argues that it must be assumed that defendant was aware of the existence of the statute when it bid the public works project, that it accepted, and the school district "obviously awarded the contract on the assumption that available Illinois laborers would be utilized by defendant." A foreign corporation, by seeking and obtaining authority to transact business in Illinois does not preclude itself from objecting to the enforcement of statutes which conflict with the Federal or State constitutions (*Michigan Millers Mutual Fire Insurance Co. v. McDonough*, 358 Ill. 575) and there is no basis upon which to hold that defendant, by bidding and accepting the contract with the Adams County school district, precluded itself from raising constitutional objections to the enforcement of the Preference Act.

Plaintiff next points out that at the time this action was commenced defendant did not have a certificate of authority to transact business in Illinois and that section 125 of the Business Corporation Act (Ill. Rev. Stat. 1973, ch. 32, par. 157.125) provides: "No foreign corporation transacting business in this State without a certificate of authority is permitted to maintain a civil action in any court of this State, until such corporation obtains a certificate of authority." He argues that defendant "should not be permitted to do indirectly (challenge the validity of the act as a matter of its defense to a complaint for injunction) what it did not and could not do directly (request a declaratory judgment finding the preference act invalid)." The answer to this argument is that section 125 also provides: "The failure of a foreign corporation to obtain a certificate of authority to transact business in this State does not impair the validity of any contract or act of such corporation, and does not prevent such corporation from defending any civil action in any court of this State."

Of the constitutional issues presented we consider first the question of equal protection. Plaintiff and *amicus*

*curiae,* The Illinois State Council of Operating Engineers, contend that the statute involves neither a "suspect" classification nor a "fundamental right," that the equal protection test to be applied is the traditional one that the classification in the statute bear some reasonable relationship to a legitimate State purpose, and that the party attacking the classification has the burden of showing an unreasonable relationship or an improper purpose. They argue that the purpose of the statute is to fulfill the desire of the State that its funds be used to help those of its citizens, who have paid taxes for at least a year, to find employment. Relying on *Heim v. McCall,* 239 U.S. 175, 60 L. Ed. 206, 36 S. Ct. 78, in which the Supreme Court held valid a New York statute similar to the one here considered, they contend that the statute provides reasonable means to achieve this legitimate State purpose. (See also *Crane v. New York,* 239 U.S. 195, 60 L. Ed. 218, 36 S. Ct. 85.) We do not agree. In our opinion, in defining an "Illinois laborer" as one who "is a citizen of the United States or has received his first naturalization papers," section 1 of the Act discriminates against resident aliens. In *Graham v. Richardson,* 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848, and *Sugarman v. Dougall,* 413 U.S. 634, 37 L. Ed. 2d 853, 93 S. Ct. 2842, the Supreme Court departed from the rationale of its earlier cases dealing with State statutes which discriminated against aliens. In *Graham* the court held that State statutes which denied welfare benefits to resident aliens, or to aliens who had not resided in the United States for a specified number of years, violated the equal protection clause of the fourteenth amendment. In reaching this result the court stated:

> "Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis. [Citations.] This is so in 'the area of economics and social welfare.' *Dandridge v. Williams,* 397 U.S. 471, 485 (1970). But the Court's decisions

have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority (see *United States v. Carolene Products Co.*, 304 U.S. 144, 152-153, n.4 (1938) for whom such heightened judicial solicitude is appropriate. Accordingly, it was said in *Takahashi*, 334 U.S., at 420, that 'the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'

Arizona and Pennsylvania seek to justify their restrictions on the eligibility of aliens for public assistance solely on the basis of a State's 'special public interest' in favoring its own citizens over aliens in the distribution of limited resources such as welfare benefits. It is true that this Court on occasion has upheld state statutes that treat citizens and noncitizens differently, the ground for distinction having been that such laws were necessary to protect special interests of the State or its citizens. Thus, in *Truax v. Raich,* 239 U.S. 33 (1915), the Court, in striking down an Arizona statute restricting the employment of aliens, emphasized that '[t]he discrimination defined by the act does not pertain to the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and the citizens of other States.' 239 U.S., at 39-40. And in *Crane v. New York,* 239 U.S. 195 (1915), the Court affirmed the judgment in *People v. Crane,* 214 N.Y. 154, 108 N.E. 427 (1915), upholding a New York statute prohibiting the employment of aliens on public works projects. The New York

court's opinion contained Mr. Justice Cardozo's well-known observation: 'To disqualify aliens is discrimination indeed, but not arbitrary discrimination, for the principle of exclusion is the restriction of the resources of the state to the advancement and profit of the members of the state. Ungenerous and unwise such discrimination may be. It is not for that reason unlawful . . . The state in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens rather than that of aliens. Whatever is a privilege rather than a right, may be made dependent upon citizenship. In its war against poverty, the state is not required to dedicate its own resources to citizens and aliens alike.' 214 N.Y., at 161, 164, 108 N.E., at 429, 430. See *Heim v. McCall,* 239 U.S. 175 (1915); *Ohio ex rel. Clarke v. Deckebach,* 274 U.S. 392 (1927). On the same theory, the Court has upheld statutes that, in the absence of overriding treaties, limit the right of noncitizens to engage in exploitation of a State's natural resources, restrict the devolution of real property to aliens, or deny to aliens the right to acquire and own land.

*Takahashi v. Fish & Game Comm'n,* 334 U.S. 410 (1948), however, cast doubt on the continuing validity of the special public-interest doctrine in all contexts. There the Court held that California's purported ownership of fish in the ocean off its shores was not such a special public interest as would justify prohibiting aliens from making a living by fishing in those waters while permitting all others to do so. It was said: 'The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide "in any state" on an equality of legal

privileges with all citizens under non-discriminatory laws.' 334 U.S., at 420.

Whatever may be the contemporary vitality of the special public-interest doctrine in other contexts after *Takahashi,* we conclude that a State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify Pennsylvania's making noncitizens ineligible for public assistance, and Arizona's restricting benefits to citizens and longtime resident aliens. First, the special public interest doctrine was heavily grounded on the notion that '[w]hatever is a privilege, rather than a right, may be made dependent upon citizenship.' *People v. Crane,* 214 N.Y., at 164, 108 N.E., at 430. But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege'. [Citations.] Second, as the Court recognized in *Shapiro:* '[A] State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. *** The saving of welfare costs cannot justify an otherwise invidious classification.' 394 U.S., at 633. Since an alien as well as a citizen is a 'person' for equal protection purposes, a concern for fiscal integrity is no more compelling a justification for the questioned classification in these cases than it was in *Shapiro.*" 403 U.S. 365, 371-75, 29 L. Ed. 2d 534, 541-43.

In *Sugarman* the court held that a statute which denied resident aliens the right to hold positions in New York's classified civil service violated the equal protection

guarantee of the fourteenth amendment. Citing *Graham,* the court stated that a classification based on alienage is suspect, and therefore it would "look to the substantiality of the State's interest in enforcing the statute in question, and to the narrowness of the limits within which the discrimination is confined." (413 U.S. 634, 642, 37 L. Ed. 2d 853, 860.) While recognizing New York's "broad power to define its political community" (see *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995), it held that under "close judicial scrutiny" the New York statute, which applied to sanitation workers, typists, and office workers, as well as to the persons who directly participate in the formulation and execution of important State policy, was neither narrowly confined nor precise in its application. In response to the argument that under the holdings in *Crane v. New York,* 239 U.S. 195; *Heim v. McCall,* 239 U.S. 175, and *Clarke v. Deckebach,* 274 U.S. 392, a State may constitutionally confine public employment to citizens, the court reiterated much of the rationale and language we have quoted from *Graham* and concluded:

> "We perceive no basis for holding the special-public-interest doctrine inapplicable in *Graham* and yet applicable and controlling here. A resident alien may reside lawfully in New York for a long period of time. He must pay taxes. And he is subject to service in this country's Armed Forces. 50 U.S.C. App. sec. 454(a). See *Astrup v. Immigration Service,* 402 U.S. 509 (1971). The doctrine, rooted as it is in the concepts of privilege and of the desirability of confining the use of public resources, has no applicability in this case. To the extent that *Crane, Heim,* and *Clarke v. Dechebach* intimate otherwise, they were weakened by the decisions in *Takahashi* and *Graham,* and are not to be considered as controlling here." 413 U.S. 634, 645.

Plaintiff attempts to distinguish *Sugarman* and *Graham* on the ground that in those cases the statutes contained prohibitions against aliens, while our statute involves only a preference discrimination against them. The holding of *Graham* and *Sugarman* is that a classification based on citizenship is suspect and subject to close judicial scrutiny, and that the State has the burden of showing that the statute is narrowly drawn to achieve a compelling State interest. Neither plaintiff nor *amicus curiae* has shown any compelling State interest in preferring resident citizens over resident aliens for employment on public work projects which can withstand the close judicial scrutiny mandated by *Graham* and *Sugarman*. We hold, as required by those decisions, that the preference against employment of resident aliens on public works projects is violative of the equal protection clause of the Federal Constitution.

We consider next the provision of section 1 of the Act that an "Illinois laborer" must have resided in Illinois "for at least one year immediately preceding his employment." Defendant argues that under the holding in *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322, this durational-residency requirement violates the equal protection guarantee. In *Shapiro* the Supreme Court held unconstitutional statutes which denied welfare assistance to persons who had not resided within the jurisdiction for at least one year. The court noted that the effect of the waiting period requirement was to create two classes of needy resident families, indistinguishable from each other, except that one was composed of residents who had resided in the jurisdiction for a year or more, and the second of residents who had resided in the jurisdiction for less than a year. Based on this sole difference the first class was granted, and the second class denied, welfare aid upon which might depend the ability of the families to obtain the very means to subsist. The court observed that since the second classification touched on the fundamental right

of interstate movement, the durational requirement must be judged by the strict equal protection standard of whether it promoted a compelling governmental interest. The court then rejected as compelling State interests justifying this penalty on the exercise of the constitutional right to interstate travel, the following: the fiscal integrity of State public aid programs; the past contribution made to the community through the payment of taxes; budget planning and predictability; administrative efficiency in determining residency by an objective standard; the need to safeguard against fraudulent receipt of benefits; and encouraging new residents to seek employment.

In footnote 21 of *Shapiro* the court stated:

"We imply no view of the validity of waiting-period *or* residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession, to hunt or fish, and so forth. Such requirements may promote compelling state interests on the one hand, or, on the other, may not be penalties upon the exercise of the constitutional right of interstate travel." 394 U.S. 618, 638 n.21, 22 L. Ed. 2d 600, 617 n.21.

Plaintiff argues that since *Shapiro* the Supreme Court has upheld the validity of State statutes requiring one year of residence in order to qualify for "resident" tuition fees as distinguished from higher "non-resident fees." (See *Starns v. Malkerson* (D. Minn. 1970), 326 F. Supp. 234, *aff'd*, (1971), 401 U.S. 985, 28 L. Ed. 2d 527, 91 S. Ct. 1231; *Kirk v. Board of Regents of University of California* (1969), 273 Cal. App. 2d 430, 78 Cal. Rptr. 260, *appeal dismissed* (1970), 396 U.S. 554, 24 L. Ed. 2d 747, 90 S. Ct. 754.) He urges us to follow this line of cases and uphold the one-year residency requirement contained in the definition of an Illinois laborer. The Supreme Court, however, in *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995, applied the *Shapiro* rationale to

invalidate a Tennessee statute requiring residence in the State for one year, and in the county for three months, as prerequisites for registration to vote, although the State closed its registration books only 30 days before an election. And in *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 39 L. Ed. 2d 306, 94 S. Ct. 1076, the court, again under the rationale of *Shapiro*, struck down an Arizona statute requiring one year's residence in the county as a condition to receiving nonemergency hospitalization or medical care at the county's expense. In *Memorial* the court stated:

> "Thus, *Shapiro* and *Dunn* stand for the proposition that a classification which 'operates to *penalize* those persons *** who have exercised their constitutional right of interstate migration,' must be justified by a compelling state interest. [Citation.] Although any durational residence requirement imposes a potential cost on migration, the Court, in *Shapiro*, cautioned that some 'waiting-period[s] *** may not be penalties.' [Citation.] In *Dunn v. Blumstein, supra*, the Court found that the denial of the franchise, 'a fundamental political right,' [citation] was a penalty requiring application of the compelling-state-interest test. In *Shapiro*, the Court found denial of the basic 'necessities of life' to be a penalty. Nonetheless, the Court has declined to strike down state statutes requiring one year of residence as a condition to lower tuition at state institutions of higher education.
>
> Whatever the ultimate parameters of the *Shapiro* penalty analysis, it is at least clear that medical care is as much 'a basic necessity of life' to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essen-

tial forms of governmental entitlements. [Citations.] " 415 U.S. 250, 258-59, 39 L. Ed. 2d 306, 315, 94 S. Ct. 1076, 1082.

In a footnote in *Memorial,* the court observed that the lower court decisions upholding the one-year residency requirement for lower tuition at State universities had not equated higher education with food, shelter and clothing. It also noted the special problems involved in determining the *bona fide* residence of college students. 415 U.S. 250, 260, 39 L. Ed. 2d 306, 316, 94 S. Ct. 1076, 1083 n.15.

"[T]he right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents." (*Memorial Hospital v. Maricopa County,* 415 U.S. 250, 261, 39 L. Ed. 2d 306, 317, 94 S. Ct. 1076, 1084.) In our opinion employment on public works projects is as "vital a government benefit and privilege" as the welfare assistance in *Shapiro* or the free medical care in *Memorial,* since its denial could result in requiring the State to grant welfare assistance or free medical care. The durational residency requirement of the preference statute must, therefore, be considered under the compelling State interest test.

The only State interest suggested by the Director in preferring older residents over newer residents for employment on public works projects is that older residents have contributed more in taxes. In *Shapiro* the court rejected the contention that the challenged classification could be sustained as an attempt to distinguish between old and new residents on the basis of the contribution they have made to the community through past payment of taxes. Such reasoning, the court stated, "would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection. Indeed it would permit the State to apportion all benefits and services according to the past tax contributions of its citizens. The Equal Protection Clause prohibits such an

apportionment of state services." 394 U.S. 618, 632-33, 22 L. Ed. 2d 600, 614; *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 261, 39 L. Ed. 2d 306, 317, 94 S. Ct. 1076, 1086.

We conclude that the one-year residency requirement for eligibility as an Illinois laborer under the statute creates an "invidious classification" that "penalizes" the right of interstate travel by denying new residents a "vital government benefit and privilege." This classification can be sustained only on a showing of a compelling State interest and plaintiff has not met the heavy burden of justification. We hold, therefore, that the one-year residency requirement violates the equal protection clause of the Federal and the Illinois constitutions.

There remains the question whether an Illinois resident can be given preference over a nonresident for employment on public works projects. In *Koelfgen v. Jackson* (D. Minn. 1972), 355 F. Supp. 243, *aff'd,* 410 U.S. 983, 36 L. Ed. 2d 173, 93 S. Ct. 1502, the court upheld a Minnesota statute giving preference in public employment to veterans. The court rejected the argument that "the right to be fairly considered for public employment" is a "fundamental right," refused to apply the "compelling State interest" test and under the traditional equal protection test held the statute valid. 355 F. Supp. 243, 250-51.

In *Dandridge v. Williams,* 397 U.S. 471, 25 L. Ed. 2d 491, 90 S. Ct. 1153, the court upheld a Maryland regulation imposing a ceiling of about $250 per month in aid to families with dependent children regardless of the size of the family and its actual need. In discussing the equal protection standard to be applied in the case, the court stated:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has

some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 288 U.S. 61, 69-70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426.

To be sure, the cases cited, and many others enunciating this fundamental standard under the Equal Protection Clause, have in the main involved state regulation of business or industry. The administration of public welfare assistance, by contrast, involves the most basic economic needs of impoverished human beings. We recognize the dramatically real factual difference between the cited cases and this one, but we can find no basis for applying a different constitutional standard. See *Snell v. Wyman,* 281 F. Supp. 853, aff'd, 393 U.S. 323. It is a standard that has consistently been applied to state legislation restricting the availability of employment opportunities. *Goesaert v. Cleary,* 335 U.S. 464; *Kotch v. Board of River Port Pilot Comm'rs,* 330 U.S. 552. See also *Flemming v. Nestor,* 363 U.S. 603." 397 U.S. 471, 485, 25 L. Ed. 2d 491, 501-02.

The purpose of the statute is to help Illinois residents find employment. As we noted, the possible alternative to employment on a public works project could be public welfare assistance. Residence in the jurisdiction is a valid requirement for public welfare and in our opinion this alternative to public welfare can also be based on

residence. We hold that Illinois can give preference to its residents for employment on public works projects without violating the equal protection clause of the Federal or Illinois constitutions.

We consider next the privileges and immunities question. In *Toomer v. Witsell,* 334 U.S. 385, 92 L. Ed. 1460, 68 S. Ct. 1157, the court stated:

"Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." 334 U.S. 385, 396, 92 L. Ed. 1460, 1471.

As we have stated, the State has a valid interest in promoting employment for its residents. The "degree of discrimination" in preferring resident laborers over nonresident laborers on public works projects "bears a close relation" to this valid purpose. We hold that the preference for employment of Illinois residents on public works projects does not violate the privileges and immunities clause of the Federal Constitution.

Defendant has cited a number of authorities for the proposition that a State may not require work to be done within its jurisdiction in order to promote local employment. (See *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 25 L. Ed. 2d 174, 90 S. Ct. 844, holding unconstitutional an

Arizona statute requiring all cantaloupes grown in the State and offered for sale to be packed in containers approved by the State prior to shipment from Arizona; *Toomer v. Witsell,* 334 U.S. 385, 92 L. Ed. 1460, 68 S. Ct. 1157, holding unconstitutional a South Carolina statute imposing a license fee for shrimp boats one hundred times greater for nonresidents than residents and requiring all shrimp boats to dock at a South Carolina port and unload, pack, and stamp their catch for taxes before transportation to another State; *Polar Ice Cream & Creamery Co. v. Andrews,* 375 U.S. 361, 11 L. Ed. 2d 389, 84 S. Ct. 378, holding unconstitutional Florida regulations which required Florida milk processors to accept their total supply of Class I milk from designated Florida producers at a fixed price; and *Baldwin v. G. A. F. Seelig, Inc.,* 294 U.S. 511, 79 L. Ed. 1032, 55 S. Ct. 497, holding unconstitutional a New York statute prohibiting New York sales of milk produced out of State if the milk was purchased below the price set by New York for similar purchases in New York.) In support of its contention that the statute here is invalid defendant argues "The Illinois statute has precisely the same end result, namely, promotion of local employment. It promotes local employment, not by requiring the work be done in Illinois as in the other cases, but by requiring Illinois residents to perform the work. In fact, the Illinois Act is more direct in its approach than the statutes in the cases cited above."

The cases upon which defendant relies are clearly distinguishable on their facts. More resembling is *American Yearbook Co. v. Askew,* 339 F. Supp. 719, *aff'd,* 409 U.S. 904, 34 L. Ed. 2d 168, 93 S. Ct. 230. *American Yearbook Co.* involved the constitutionality of a statute and regulations which required that all public printing of the State of Florida be done in Florida. In response to the contention that the statute violated the commerce clause under the holdings in *Baldwin v. G. A. F. Seelig* and *Polar Ice Cream & Creamery Co. v. Andrews,* the court said: "What

plaintiff·fails to recognize is that those statutes regulated private industry. Trade regulations are clearly subject to Commerce Clause restrictions, but statutes that merely specify the conditions of state purchases are not." 339 F. Supp. 719, 725.

Defendant quarrels with the rationale of *American Yearbook Co.* and argues "So long as there is a burden on interstate commerce, in determining whether such burden is constitutionally permissible, it does not matter whether the burden was created by a state statute requiring private industry to use only in-state products or labor, or whether it was created by a state statute requiring the state to use only in-state products or labor. If the burden is the same and the purpose is the same, the uconstitutionality rests upon the same principle."

We need not subject the rationale of *American Yearbook Co.* to critical examination. The fact is that the Supreme Court has affirmed the holding that a statute requiring that all public printing of the State be done in the State does not violate the commerce clause. In our opinion the statute here attacked, in providing a preference for Illinois residents as laborers on public works projects, and which, unlike the Florida printing statute, does not totally exclude nonresidents, does not violate the commerce clause.

Defendant's other contentions require no discussion. We find no basis for holding that the Preference Act conflicts with Title VII of the Federal Civil Rights Act of 1964, the Illinois Fair Employment Practices Act or the Bill of Rights of the Constitution of 1970.

Having held invalid the provisions of section 1 which require citizenship or receipt of first naturalization papers and the minimum of one year of residence to qualify as an "Illinois laborer," there remains to be determined whether the validity of the remainder of the statute can be upheld. In *People ex rel. Adamowski v. Wilson,* 20 Ill.2d 568, after holding invalid a classification provided in section 9–87 of

the Revised Cities and Villages Act (Ill. Rev. Stat. 1959, ch. 24, par. 9—87) the court, considering whether the remainder of the section was separable and valid, said "The question thus presented is one of separability. 'The fact that a part of an act is unconstitutional does not require that the remainder shall be held void unless all the provisions are so connected as to depend upon each other. The valid and invalid provisions may even be contained in the same sentence and yet be perfectly distinct and separable so that the former may stand though the latter fall.' (*McDougall v. Lueder*, 389 Ill. 141, 155.) If what remains after the invalid portion is stricken is complete in itself and capable of being executed wholly independently of that which is rejected, the invalid portion does not render the entire section unconstitutional unless it can be said that the General Assembly would not have passed the statute with the invalid portion eliminated. [Citations.] " 20 Ill.2d 568, 581-82.

In our opinion the General Assembly intended, to the extent constitutionally permissible, to prefer residents of Illinois for employment on public works projects and we are unable to say that the statute would not have been enacted with the invalid portions eliminated.

For the reasons stated the judgment is reversed and the cause is remanded to the circuit court of Adams County for further proceedings.

*Reversed and remanded.*