[No. B140258. Second Dist., Div. Five. Feb. 27, 2001.]

ANTONETTE NIEDLE, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, LA SALSA
HOLDING COMPANY et al., Respondents.

**COUNSEL**

Lawrence Drasin & Associates and Lawrence Drasin for Petitioner.

Stockwell, Harris, Widom & Woolverton and Carl E. Rosenquist for Respondents La Salsa Holding Company and California Indemnity Insurance Company.

No appearance for Respondent Workers' Compensation Appeals Board.

## OPINION

## GODOY PEREZ, J.—

### INTRODUCTION

Antonette Niedle seeks a writ of review after the Workers' Compensation Appeals Board (Board) denied her petition for reconsideration and, thereby, affirmed the workers' compensation judge's (WCJ) decision.

The primary issue presented is whether California Labor Code section 4644, subdivision (g) violates the equal protection clause of the United States Constitution (U.S. Const., 14th Amend.) because it impedes the right to travel, or otherwise serves no rational purpose.[1] Section 4644, subdivision (g) requires an out-of-state vocational rehabilitation plan be more cost-effective than an in-state plan. We hold that section 4644, subdivision (g) does not impede the right to travel because that right does not obligate a state to continue providing the same benefits to a former resident who has moved to another state. We also hold that the statute does not violate petitioner's right to equal protection of the laws since it costs more to administer out-of-state vocational rehabilitation plans and the statute therefore serves a rational purpose.

We affirm the Board's order.

### FACTUAL AND PROCEDURAL SUMMARY

Antonette Niedle sustained a work-related injury while employed by La Salsa Holding Company (LSHC). Subsequently, Niedle moved to Nevada. The parties agreed on a vocational rehabilitation plan for Niedle to complete the course units necessary for a teaching credential. The vocational rehabilitation coordinator compared the costs of obtaining a teaching credential in Nevada as opposed to California. Nevada costs were $637 more.

LSHC refused to pay based on section 4464, subdivision (g) and obtained a favorable decision from the Rehabilitation Unit. Niedle appealed the decision of the Rehabilitation Unit to the WCJ, contending the statute violated her constitutional right to travel. The WCJ upheld the Rehabilitation Unit's decision, but also stated that he had no jurisdiction to determine the

---

[1]Section 4644, subdivision (g) provides: "An employer shall not be liable to provide vocational rehabilitation services at a location outside the state, unless upon agreement of the employer and the employee, or a determination by the Division of Workers' Compensation that those services are more cost-effective than similar services provided in the state."

All further statutory references are to the Labor Code unless otherwise indicated.

constitutionality of a statute. Niedle petitioned for reconsideration. The Board granted reconsideration, affirmed the WCJ's decision, and adopted the WCJ's report and recommendation on reconsideration.

Niedle petitioned this court for a writ of review, which was denied. The Supreme Court granted Niedle's petition for review and transferred the matter to us with directions to vacate our order denying the petition and to issue a writ of review. We issued a writ of review and heard oral argument. After reconsidering the matter, we conclude section 4644, subdivision (g) is not unconstitutional.

DISCUSSION

1. *Standard of review.*

Because the Board lacks the authority to declare a statute unconstitutional, the standard of review is de novo. (Cal. Const., art. III, § 3.5; *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028 [25 Cal.Rptr.2d 539, 863 P.2d 784].)

2. *Constitutionality of section 4644, subdivision (g).*

Niedle contends that the statute violates her constitutional right to travel, thereby requiring strict scrutiny. Niedle cites, with little analysis, several United States Supreme Court decisions holding that a state may not deny new residents the same benefits old residents receive: *Dunn v. Blumstein* (1972) 405 U.S. 330, 338 [92 S.Ct. 995, 1001, 31 L.Ed.2d 274] (Tennessee statute requiring a year's residence before receiving the right to vote held violation of right to travel); *Hooper v. Bernalillo County Assessor* (1985) 472 U.S. 612, 618 [105 S.Ct. 2862, 2866, 86 L.Ed.2d 487] (New Mexico statute granting property tax exemption to Vietnam veterans who resided in state prior to May 8, 1975, held an unconstitutional impingement on the right to travel); *Attorney General of N.Y. v. Soto-Lopez* (1986) 476 U.S. 898 [106 S.Ct. 2317, 90 L.Ed.2d 899] (New York statute limiting civil service veterans preference to only those veterans who were residents of state when they entered military service held unconstitutional impingement on right to travel); *Zobel v. Williams* (1982) 457 U.S. 55 [102 S.Ct. 2309, 72 L.Ed.2d 672] (Alaska statute distributing income from minerals to citizens based on length of residency held unconstitutional violation of right to travel); *Memorial Hospital v. Maricopa County* (1974) 415 U.S. 250 [94 S.Ct. 1076, 39 L.Ed.2d 306] (Arizona statute denying free nonemergency medical care to indigents who had resided in state less than one year held violation of right to travel); *Saenz v. Roe* (1999) 526 U.S. 489 [119 S.Ct.

1518, 143 L.Ed.2d 689] (California statute paying welfare benefits equivalent to those paid by prior state of residence for one year held unconstitutional violation of right to travel).

We do not agree. We conclude the petitioner's right to travel was not penalized, and thus strict scrutiny of California's statutory classification is not required. The cases cited by Niedle do not support the proposition that a classification based upon residence is subject to strict scrutiny when attacked by one who has migrated from the state which denied the benefit in question. (*Fisher v. Reiser* (9th Cir. 1979) 610 F.2d 629, cert. den. (1980) 447 U.S. 930 [100 S.Ct. 3029, 65 L.Ed.2d 1124].)

■ The equal protection clause of the Fourteenth Amendment to the United States Constitution prohibits a state from denying any person within its jurisdiction equal protection of the laws. (U.S. Const., 14th Amend.) The equal protection clauses of the federal and state Constitutions are "essentially a direction that all persons similarly situated should be treated alike." (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 439 [105 S.Ct. 3249, 3254, 87 L.Ed.2d 313]; *In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549].) The provisions of the California Constitution guaranteeing equal protection are "substantially the equivalent of the equal protection clause of the Fourteenth Amendment." *(Dept. of Mental Hygiene v. Kirchner* (1965) 62 Cal.2d 586, 588 [43 Cal.Rptr. 329, 400 P.2d 321].) Hence, "where the charge is that equal protection is denied, the effect of both constitutions is the same." (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 603, pp. 57-58.)

■ When confronted with the question of whether a statute operates to deny one the right to equal protection under the law, the reviewing court must first determine the appropriate standard of review. (*Ayala v. Superior Court* (1983) 146 Cal.App.3d 938, 942-943 [194 Cal.Rptr. 665].) As discussed in *Ayala* at page 943: "When reviewing legislative classifications under the equal protection clauses of the United States and California Constitutions, the classification is generally presumed to be constitutional. [Citation.] 'However, once it is determined that the classification scheme affects a fundamental interest or right the burden shifts; thereafter the state must first establish that it has a compelling interest which justifies the law and then demonstrate that the distinctions drawn by the law are necessary to further that purpose.' . . . [Citation.]" (Italics omitted.)

If a fundamental interest or a "suspect classification" is not at stake, the inquiry is less stringent because the reviewing court is merely "directed to the question of whether or not the statutory classification bears a 'rational

relationship' to a conceivable legitimate state purpose." (*Ayala v. Superior Court, supra,* 146 Cal.App.3d at p. 943.)

██ Thus, the first question is what level of review is appropriate. (*Attorney General of N.Y. v. Soto-Lopez, supra,* 476 U.S. at pp. 906-907, fn. 6 [106 S.Ct. at pp. 2322-2324].) "[W]e must, as an initial matter, determine whether or not the State's laws actually burden [Niedle's] right to travel." (*Id.* at p. 907, fn. 6 [106 S.Ct. at p. 2323].)[2]

The obligation imposed on the state to grant immediate or reasonably prompt recognition to a newly arrived citizen cannot be the basis for automatically imposing a reverse obligation on the former state to continue to care for the former resident. (*Califano v. Torres* (1978) 435 U.S. 1 [98 S.Ct. 906, 55 L.Ed.2d 65].) In *Torres,* various old age and disability benefits under the Supplemental Security Income Act were payable only while the claimant resided in one of the 50 states or the District of Columbia. Torres moved to Puerto Rico and the benefit was terminated. The Supreme Court declined to hold that the right to travel requires that a person who moves to another state is entitled to receive benefits enjoyed in his former state of residence since doing so would "require a State to continue to pay those benefits indefinitely to any persons who had once resided there." (*Id.* at p. 4 [98 S.Ct. at p. 908].)

Relying on *Califano v. Torres, supra,* 435 U.S. 1, the Ninth Circuit in *Fisher v. Reiser, supra,* 610 F.2d 629, contrasted a California resident's claim for supplemental workers' compensation benefits from Nevada with three Supreme Court cases discussing withholding of rights or benefits as a result of interstate migration.[3] The court held the statute did not burden the right of travel in a manner requiring strict scrutiny.

Mr. Fisher, a Nevada resident, was receiving Nevada workers' compensation benefits. Subsequently, he and his wife moved to California. Mr. Fisher died, but his wife continued to receive reduced benefits. Nevada supplemented the benefits to meet the cost of living. Mrs. Fisher petitioned for an

---

[2]At oral argument, the attorney for LSHC's insurer suggested that *Vincent v. Delta Airlines* (WCAB, Jan. 4, 1999) VNO 0299136, VNO 0299138, had established that section 4644, subdivision (g) did not violate the right to travel. It did not. Vincent prematurely attempted to resolve this issue. After reconsideration, the Board remanded for the Rehabilitation Unit to compare the costs of the plans. The Court of Appeal dismissed Vincent's petition for review as premature (B129494, Mar. 30, 1999). The California Supreme Court (S078026, May 26, 1999) and the United States Supreme Court (99-684, Jan. 10, 2000) denied review. The parties subsequently settled according to Vincent's attorney, Esther Oz, who appeared with Niedle's attorney in this action, as she had been denied permission to file an amicus curiae brief.

[3]*Shapiro v. Thompson* (1969) 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600]; *Dunn v. Blumstein, supra,* 405 U.S. 330; *Memorial Hospital v. Maricopa County, supra,* 415 U.S. 250.

increase, but was denied. She presented the issue to the Ninth Circuit as a denial of equal protection and a restriction on her right to travel. The Ninth Circuit stated: "[W]hen we contrast the claim presented here with that of the three principal Supreme Court cases discussing withholding of rights or benefits as a result of interstate migration, we find that the absence of a political or residential relation between the claimant and the state, the absence of a durational residency requirement, and the fact that eligibility is not based upon need are all factors which detract from the strength of the claim to such an extent that the statutory classification does not burden the right of travel in a manner requiring strict scrutiny." (*Fisher v. Reiser, supra,* 610 F.2d at p. 636.)

The court explained further, "In *Shapiro, Dunn,* and *Maricopa County,* the issue involved the obligation and responsibility of the claimant's new state of residence; here the claimants seek to enforce an obligation against the state of former residence. The distinction is critical. Any primary obligation to ascertain a citizen's economic status or condition and to make provision for his or her well-being falls upon the state of current residence, not the state where the citizen formerly resided. It is a fact of our federal system that a state is limited, both in its competence and its responsibility, to exercising its welfare powers for those persons who are its residents, and, perhaps in some cases, those temporarily within its borders. We find no authority for the broad proposition that Nevada must pass prospective legislation with reference to the subsistence or economic well-being of persons formerly residing in it but who are now resident elsewhere, or include former residents in statutes passed to aid current residents. In *Shapiro, Dunn,* and *Maricopa County,* on the other hand, the state with whom the claimant had a new and existing political relation refused to recognize that status without the imposition of a durational waiting period. That period discriminated against those who had recently exercised their right of interstate migration. . . ." (*Fisher v. Reiser, supra,* 610 F.2d at pp. 633-634, fn. omitted.)

Niedle, now residing in Nevada, similarly argues that California has failed to provide her with the same benefits a California resident entitled to vocational rehabilitation due to a workers' compensation injury would enjoy. We are persuaded by the reasoning in *Fisher v. Reiser, supra,* 610 F.2d 629. Therefore, we hold that section 4644, subdivision (g) does not burden the right of travel in a manner requiring strict scrutiny.

Niedle also cites *Crandall v. State of Nevada* (1868) 73 U.S. (6 Wall.) 35, 46 [18 L.Ed. 745, 748] (Nevada statute imposing $1 tax on every resident leaving the state and on nonresidents just passing through held unconstitutional). Also, in a decision not cited by either party, the California Supreme

Court found violation of the right to travel when the state increased the penalty for failure to pay child support from a misdemeanor to a felony if the father left the state for more than 30 days. (*In re King* (1970) 3 Cal.3d 226 [90 Cal.Rptr. 15, 474 P.2d 983].)

Both decisions are distinguishable. *Crandall* involved a direct tax impeding the right of federal citizens to travel freely between states. *In re King* considered a direct punishment for leaving the state. Niedle is subjected only to a different requirement in order to receive a California benefit in another state. This court declines to expand the right to travel to fit the instant facts based on inapt precedents.

We turn then to the question whether the distinction between residents and nonresidents violates the equal protection clause, even if no right to travel concerns are implicated.

A law will be sustained under the equal protection clause if it can be said to advance a legitimate government interest. This is true even if the law seems unwise or works to the disadvantage of a particular group or if the rationale for it seems tenuous. (*Romer v. Evans* (1996) 517 U.S. 620 [116 S.Ct. 1620, 134 L.Ed.2d 855].) In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any statement of reasonably conceivable facts that could provide a rational basis for the classification. (*Sullivan v. Stroop* (1990) 496 U.S. 478, 485 [110 S.Ct. 2499, 2504, 110 L.Ed.2d 438]; *Bowen v. Gilliard* (1987) 483 U.S. 587, 600-603 [107 S.Ct. 3008, 3016-3018, 97 L.Ed.2d 485]; *U. S. Railroad Retirement Bd. v. Fritz* (1980) 449 U.S. 166, 174 [101 S.Ct. 453, 459, 66 L.Ed.2d 368]; *Dandridge v. Williams* (1970) 397 U.S. 471, 481-485 [90 S.Ct. 1153, 1159-1161, 25 L.Ed.2d 491].)

The purpose of the Workers' Compensation Reform Act of 1989 and cleanup legislation of 1993, which included the measure that ultimately became section 4644, subdivision (g), was to cut the costs of workers' compensation to keep business from fleeing the state. (Sen. Rules Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Mar. 5, 1993); Sen. Appropriations. Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Mar. 5, 1993); Sen. Ways and Means Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Apr. 12, 1993.)

As an employer's premium is based, in part, on how much compensation has been paid on its behalf in the past, the reform legislation was specifically

directed at lowering insurance costs to the employer. (Sen. Rules Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Mar. 5, 1993); Sen. Appropriations. Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Mar. 5, 1993); Sen. Ways and Means Com., Analysis of Assem. Bill No. 110 (1992-1993 Reg. Sess.) as amended Apr. 12, 1993.)

■ There are higher administrative costs involved in monitoring an out-of-state vocational rehabilitation plan. (See Silberman & Wulz, Rehabilitation: The Cal. System (Alliance of Vocational Educators (1992) pp. 332-333.)

Thus, to reduce costs, an out-of-state plan is prohibited unless it is more cost effective in order to offset additional administrative costs. This is a rational basis for the distinction between in-state and out-of-state vocational rehabilitation plans.

Niedle also argues that workers' compensation benefits are not social welfare legislation because they are paid by insurance companies, implying that a higher level of scrutiny should apply. ■ We note that social welfare legislation is entitled, to a presumption of constitutionality.[4] We further note that *Fisher* commented that the supplemental compensation was not paid by insurers but was a state benefit paid from the general fund. (*Fisher v. Reiser, supra*, 610 F.2d at pp. 636-637.)[5] However, Niedle has not provided any authority requiring a different standard of scrutiny. Regardless,

---

[4]As the court said in *Califano v. Torres, supra*, 435 U.S. at page 5 [98 S.Ct. at page 908]: "If there ever could be a case where a person who has moved from one State to another might be entitled to invoke the law of the State from which he came as a corollary of his constitutional right to travel, this is surely not it. For we deal here with a constitutional attack upon a law providing for governmental payments of monetary benefits. Such a statute 'is entitled to a strong presumption of constitutionality.' *Mathews v. De Castro*, 429 U.S. 181, 185 [97 S.Ct. 431, 434, 50 L.Ed.2d 389] (1976). 'So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket.' *Jefferson v. Hackney*, 406 U.S. 535, 546 [92 S.Ct. 1724, 1731, 32 L.Ed.2d 285] (1972). See also *Califano v. Jobst*, 434 U.S. 47, 53-54 [98 S.Ct. 95, 99-100, 54 L.Ed.2d 228]; *Califano v. Goldfarb*, 430 U.S. 199, 210 [97 S.Ct. 1021, 1028-1029, 51 L.Ed.2d 270] (1977); *Helvering v. Davis*, 301 U.S. 619, 640 [57 S.Ct. 904, 908, 81 L.Ed.2d 1307, 109 A.L.R. 1319] (1937)."

[5]*Fisher* reasoned that, from the group of workers' compensation beneficiaries, the statute identified a subclass consisting of Nevada residents. The cost-of-living inflationary supplement was limited to the subclass. That this group was treated as a discrete entity is apparent from the funding provisions made for the supplemental benefits. The basic industrial insurance benefits, available to residents and nonresidents alike, were paid from an insurance fund established and maintained by Nevada employers, with a fixed schedule of benefits. (*Fisher v. Reiser, supra*, 610 F.2d at p. 631.) The subsequent, distinct Nevada legislative action to grant a cost-of-living increase to the subclass of residents was payable not from this insurance fund but from general funds of the State of Nevada. (Nev. Rev. Stat. §§ 616.626, 616.628.) Nevada

this court has not relied on a presumption of constitutionality to find that a rational relationship for the statute exists.

 Niedle also contends that there is no legitimate basis for the statute—that if its purpose were cost savings, it would say so but does not. Further, that section 139.5 was amended at the same time and puts a cap on total vocational rehabilitation costs, which leads to the inevitable conclusion that section 4644, subdivision (g) must have only a discriminatory purpose.

The Legislature is not required to state its intent in every statute. A cost containment intent expressed in one statute does not preclude a related statute from also containing costs without stating that as its purpose.

Finally, Niedle questions how the Legislature can constitutionally limit vocational rehabilitation benefits for those injured workers who reside outside the state when the other benefits, permanent disability compensation, temporary disability compensation, present and future medical care, are not similarly limited.

No evidence regarding the other benefits was adduced below and this argument was not more fully developed. We assume, therefore, without deciding, that the administrative cost associated with these other benefits remains the same regardless.

DISPOSITION

The Board's order denying reconsideration is affirmed.

Armstrong, J., concurred.

**TURNER, P. J.**—I concur in the judgment. I write separately to emphasize why there has been no denial of the constitutional right to travel. In *Saenz v. Roe* (1999) 526 U.S. 489, 500 [119 S.Ct. 1518, 1525, 143 L.Ed.2d 689], the United States Supreme Court identified three separate situations in which the travel right had been defined in its prior decisions. The Supreme Court held: "The 'right to travel' discussed in our cases embraces at least three different

---

has a legitimate interest in confining payments to those most likely to spend them within the territorial limits of the state. (*Califano v. Aznavorian* (1978) 439 U.S. 170, 178 [99 S.Ct. 471, 475-476, 58 L.Ed.2d 435].) *Fisher* reasoned further that the Legislature rationally may have concluded that it was more familiar with the needs of in-state recipients of workers' compensation, and that there may be additional factors supporting the decision, including the costs of administering the payments for, and ascertaining eligibility of, out-of-state residents. *Fisher* found that the challenged classification rationally furthers all these legitimate state interests. (*Fisher v. Reiser, supra*, 610 F.2d at p. 637.)

components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." (*Ibid.*)

The first aspect of the constitutional travel right is "the right to go from one place to another, including the right to cross state-borders while en route . . . ." (*Saenz v. Roe, supra,* 526 U.S. at p. 500 [119 S.Ct. at p. 1525].) In *Saenz,* the Supreme Court examined a California law which limited the maximum welfare benefits available to newly arrived residents. The Supreme Court concluded that such a reduction in the amount of welfare benefits did not constitute an obstacle to entry into this state. (*Id.* at p. 501 [119 S.Ct. at p. 1525].) In the present case, the funding requirement imposed by Labor Code section 4644, subdivision (g) obviously does not interfere with the right of an injured employee to cross state borders.

The second aspect of the constitutional travel right finds its basis in article IV, section 2 of United States Constitution, the privileges and immunities clause, which states, "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." In *Saenz,* the United States Supreme Court set forth the pertinent privileges and immunities clause analysis as follows: "Thus, by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits. This provision removes 'from the citizens of each State the disabilities of alienage in the other States.' *Paul* v. *Virginia* [(1868) 75 U.S. (8 Wall.) 168, 179 [19 L.Ed. 357, 359-360]] ('[W]ithout some provision . . . removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists'). It provides important protections for nonresidents who enter a State whether to obtain employment, *Hicklin* v. *Orbeck,* 437 U.S. 518 [98 S.Ct. 2482, 57 L.Ed.2d 397] (1978), to procure medical services, *Doe* v. *Bolton,* 410 U.S. 179, 200 [93 S.Ct. 739, 751-752, 35 L.Ed.2d 201] (1973), or even to engage in commercial shrimp fishing, *Toomer* v. *Witsell,* 334 U.S. 385 [68 S.Ct. 1156, 92 L.Ed. 1460] (1948). Those protections are not 'absolute,' but the Clause 'does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.' *Id.,* at 396. There may be a substantial reason for requiring the nonresident to pay more than the resident for a hunting license, see *Baldwin* v. [*Montana*]

*Fish and Game Comm'n . . .* , 436 U.S. 371, 390-391 [98 S.Ct. 1852, 1863-1864, 56 L.Ed.2d 354] (1978), or to enroll in the state university, see *Vlandis* v. *Kline*, 412 U.S. 441, 445 [93 S.Ct. 2230, 2232-2233, 37 L.Ed.2d 63] (1973), but our cases have not identified any acceptable reason for qualifying the protection afforded by the Clause for 'the "citizen of State A who ventures into State B" to settle there and establish a home.' *Zobel* [*v. Williams* (1982) 457 U.S. 55, 74 [102 S.Ct. 2309, 2320, 72 L.Ed.2d 672]] (O'CONNOR, J., concurring in judgment). Permissible justifications for discrimination between residents and nonresidents are simply inapplicable to a nonresident's exercise of the right to move into another State and become a resident of that State." (*Saenz v. Roe, supra*, 526 U.S. at pp. 501-502 [119 S.Ct. at pp. 1525-1526], fn. omitted.)

As can be noted, the United States Supreme Court in *Saenz* held there can be constitutionally legitimate discrimination under the privileges and immunities clause and cited to its prior decision in *Toomer v. Witsell, supra*, 334 U.S. at page 396 [68 S.Ct. at page 1162]. In *Toomer*, the Supreme Court set forth the standard of review of a privileges and immunities clause claim as follows: "Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." (*Ibid.*, fn. omitted.) In the face of a proper substantial reason, there may be constitutionally valid discrimination under the privileges and immunities clause. *Toomer* further defined the justification that must be present in order for a nonresident's privileges and immunities clause claim to be rejected as follows, "[T]he purpose of that clause . . . is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." (*Toomer v. Witsell, supra*, 334 U.S. at p. 398 [68 S.Ct. at p. 1163]; accord, *United Building & Constr. Trades v. Mayor* (1984) 465 U.S. 208, 222 [104 S.Ct. 1020, 1029-1030, 79 L.Ed.2d 249].)

Further, in *Saenz*, while discussing the privileges and immunities clause aspect of the travel right, the United States Supreme Court cited as an example of allowable discrimination the discussion in *Vlandis v. Kline, supra*, 412 U.S. at page 445 [93 S.Ct. at pages 2232-2233] where it was

unquestioned that the State of Connecticut had a right to impose higher college tuition on nonresident students. Later, in *Vlandis*, the Supreme Court again addressed the issue of discriminatory tuition charges and stated: "Our holding today should in no wise be taken to mean that Connecticut must classify the students in its university system as residents, for purposes of tuition and fees, just because they go to school there. Nor should our decision be construed to deny a State the right to impose on a student, as one element in demonstrating bona fide residence, a reasonable durational residency requirement, which can be met while in student status. We fully recognize that a State has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis." (*Id.* at pp. 452-453 [93 S.Ct. at pp. 2236-2237], fn. omitted.) The omitted footnote in the foregoing quotation from *Vlandis* cited to the decision of the California Court of Appeal in *Kirk v. Regents of University of California* (1969) 273 Cal.App.2d 430 [78 Cal.Rptr. 260]. *Kirk* concluded a one-year residency requirement before a University of California student could receive reduced tuition rates did not violate the constitutional travel right. (*Id.* at p. 440.)

Another relevant decision cited in *Saenz* is *Baldwin v. Montana Fish and Game Comm'n, supra,* 436 U.S. at pages 390-391 [98 S.Ct. at pages 1863-1864]. *Baldwin* drew another boundary on a travel right claim arising under the privileges and immunities clause. *Baldwin* held: "Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do. [Citations.] Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." (*Id.* at p. 383 [98 S.Ct. at p. 1860].)

The foregoing body of constitutional law leads to the following conclusions concerning a privileges and immunities clause claim arising in the travel right context. The travel right is not absolute. (*Saenz v. Roe, supra,* 526 U.S. at p. 500 [119 S.Ct. at p. 1525]; *Toomer v. Witsell, supra,* 334 U.S. at p. 396 [68 S.Ct. at p. 1162].) A state may defeat a privileges and immunities clause claim by showing "a substantial reason" for the discriminatory treatment of the person who has left or entered its boundaries. (*Toomer v. Witsell, supra,* 334 U.S. at p. 396 [68 S.Ct. at p. 1162]; *United Building & Constr. Trades v. Mayor, supra,* 465 U.S. at p. 222 [104 S.Ct. at p. 1029].) Further, states have "considerable leeway" in determining whether

local problems require legislative action. (*Lunding v. New York Tax Appeals Tribunal* (1998) 522 U.S. 287, 298 [118 S.Ct. 766, 774, 139 L.Ed.2d 717]; *Toomer v. Witsell, supra,* 334 U.S. at p. 396 [68 S.Ct. at p. 1162].) Moreover, in the higher education context, states may engage in reasonably based discriminatory conduct utilizing residence as a cost or funding factor. (*Saenz v. Roe, supra,* 526 U.S. at p. 500 [119 S.Ct. at p. 1525] [privileges and immunities clause and travel right claims]; *Vlandis v. Kline, supra,* 412 U.S. at pp. 452-453 [93 S.Ct. at pp. 2236-2237] [due process clause claim]; *Kirk v. Regents of University of California, supra,* 273 Cal.App.2d at p. 440 [equal protection claim].) Finally, if a privilege or immunity does not bear on the vitality of the nation, discriminatory treatment against a nonresident may be constitutional. (*Supreme Court of Virginia v. Friedman* (1988) 487 U.S. 59, 64-65 [108 S.Ct. 2260, 2263-2265, 101 L.Ed.2d 56]; *Baldwin v. Montana Fish and Game Comm'n, supra,* 436 U.S. at p. 383 [98 S.Ct. at p. 1860].)

Application of these principles demonstrates Labor Code section 4644, subdivision (g) does not violate any travel right premised on the privileges and immunities clause. This case involves funding for college training. The statutory requirement funding limitations imposed on a nonresident are premised on a need to contain spiraling expenditures and an out-of-state vocational rehabilitation program involves higher costs. (See maj. opn., *ante,* at pp. 291-292.) The limited cost limitation imposed by Labor Code section 4644, subdivision (g) does not bear on the vitality of the nation; out-of-state residents are still entitled to vocational training, only subject to the narrow limitation resulting from a need to control spiraling workers' compensation expenditures. Although the issue is close, given the considerable leeway accorded states under our federal system to determine the extent of their funding for higher education, no privileges and immunities clause violation has occurred under the extremely narrow circumstances present in this case.

The third aspect of the travel right identified in *Saenz* is the right of newly arrived citizens to the same privileges and immunities enjoyed by other residents of this state. (*Saenz v. Roe, supra,* 526 U.S. at pp. 506-507 [119 S.Ct. at pp. 152-1528].) The present case does not involve a newly arrived resident. In this regard, *Saenz* is not controlling.

Nonetheless, even if the issue is whether residents of *Nevada* must be treated exactly the same as those of *California,* the crucial analysis in *Saenz* as to this third aspect of the travel right is as follows: "Disavowing any desire to fence out the indigent, California has instead advanced an entirely fiscal justification for its multitiered scheme. The enforcement of [Welfare and Institutions Code section] 11450.03 will save the State approximately $10.9 million a year. The question is not whether such saving is a legitimate

purpose but whether the State may accomplish that end by the discriminatory means it has chosen. An evenhanded, across-the-board reduction of about 72 cents per month for every beneficiary would produce the same result. But our negative answer to the question does not rest on the weakness of the State's purported fiscal justification. It rests on the fact that the Citizenship Clause of the Fourteenth Amendment expressly equates citizenship with residence: 'That Clause does not provide for, and does not allow for, degrees of citizenship based on length of residence.' [Citation.] It is equally clear that the Clause does not tolerate a hierarchy of 45 subclasses of similarly situated citizens based on the location of their prior residence. Thus [Welfare and Institutions Code section] 11450.03 is doubly vulnerable: Neither the duration of respondents' California residence, nor the identity of their prior States of residence, has any relevance to their need for benefits. Nor do those factors bear any relationship to the State's interest in making an equitable allocation of the funds to be distributed among its needy citizens." (*Saenz v. Roe*, *supra*, 526 U.S. at pp. 506-507 [119 S.Ct. at p. 1528], fn. omitted.)

The present case is materially different from *Saenz*. Supervision of out-of-state recipients of vocational retraining involves greater costs then those incurred when monitoring retraining inside California. (See maj. opn., *ante*, at p. 292.) This is in contrast to the situation in *Saenz* where there was no correlation between the duration of the welfare recipient's California residence, nor the identity of their prior residence and their need for benefits. (*Saenz v. Roe*, *supra*, 526 U.S. at pp. 506-507 [119 S.Ct. at pp. 1527-1528].) Here, the correlation is clear—it costs more for the out-of-state training to be monitored by California officials. Further, this case involves reimbursement for college tuition costs, not payments for "food, clothing and shelter." (*Kirk v. Regents of University of California*, *supra*, 273 Cal.App.2d at p. 440.) No travel right violation has occurred.

On March 15, 2001, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied May 23, 2001.