183 Cal.App.4th 458 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
BARRY ALLEN TURNAGE, Defendant and Appellant.
No. C059887.
Court of Appeals of California, Third District.
April 1, 2010.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*460 Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

*461 OPINION
RAYE, Acting P. J.

INTRODUCTION
A jury convicted defendant Barry Allen Turnage of maliciously placing a false or facsimile bomb in 2006 with the intent to cause others to fear for their safety (Pen. Code, § 148.1, subd. (d)),[1] found he was legally sane at the time of the commission of the offense, and found he had two prior convictions that came within the meaning of section 667, subdivision (d). Based on the evidence it heard at trial regarding the present offense, the trial court found that defendant violated his probation in a 2004 drug case, in which there was a suspended imposition of sentence. The court sentenced defendant to state prison for the upper term on the 2004 offense, with a consecutive indeterminate prison term of 25 years to life for the present offense. (§ 667, subd. (e)(2)(A)(ii).)
On appeal, defendant contends his felony sentence for placing a false bomb violates his constitutional right to equal protection, because placing a false weapon of mass destruction (WMD) under similar circumstances (without causing "sustained fear") is only a misdemeanor (§§ 11418.1, 11418.5, subd. (b)), and to due process, because "false or facsimile bomb" is too vague a term. He contends the trial court should have granted his motion for acquittal (§ 1118.1) because there was insufficient evidence of a false bomb, or of his intent to cause others to fear for their safety. He also claims that there is insufficient evidence to support the recidivist finding based on his 1985 entry of a guilty plea, because the 1985 court did not have jurisdiction to accept a withdrawal of his 1978 plea of not guilty by reason of insanity (NGI) to the charge. Finally, he contends that if we reverse his present conviction we must reverse the court's finding that he violated probation and remand for further proceedings in the 2004 case.
In the published portion of this opinion, we agree that defendant is similarly situated to someone convicted of the misdemeanor of placing a false WMD that did not cause sustained fear, and the legislative history of that provision shows that no reason exists to treat the two offenses differently for purposes of punishment. Therefore, we conclude that a violation of section 148.1, subdivision (d) (hereafter section 148.1(d)) is punishable only as a misdemeanor. We reject the remainder of defendant's arguments in the unpublished part. We therefore vacate the sentence on the 2006 offense and remand the matter for resentencing.

*462 FACTS
The Yolo County Communications Center (YCCC) in Woodland is the 24-hour dispatch headquarters for the county's police, fire, and ambulance services. It is located in the middle of a parking lot, surrounded by other buildings. In order to enter the parking lot, a driver must stop at a keypad that activates a gate.
In September 2006 a YCCC dispatcher was returning from a coffee run on a Sunday morning. As she approached the road leading to the gate, she noticed a maroon Ford Thunderbird that was backing up. She testified that she remembered the car clearly because it was similar to the car of a dispatcher who had recently left the job. However, her suspicions were aroused when the driver leaned over toward the passenger side in a maneuver that looked uncomfortable and struck her as unusual, as if he were trying to conceal his face.
As the dispatcher passed the Thunderbird and approached the keypad, she saw a box underneath it with a flag sticking out of its top and "C-4" written on the side facing her.[2] This had not been there when she left 15 to 20 minutes earlier. She was scared, because she knew C-4 was an explosive and thought that this might be a bomb, even though it did not have any external indications of a fuse. She parked in her spot on the other side of the building. When she entered the YCCC, she announced to the others in the room that there was a bomb threat, and she placed a telephone call to the police instead of using the radio because the latter could trigger some types of bombs. The employees waited inside for the police to arrive, which took about 15 minutes. By this time, her shift had ended and she walked outside to meet the police. No one else left the building, and as far as the dispatcher could recall the YCCC operations were not interrupted.
A police officer who heard the bomb report saw a maroon Thunderbird parked in front of a nearby coffee shop. Through the coffee shop window, the officer saw defendant, who matched the general description of the driver of the Thunderbird. He was drawing on some newspapers. The officer entered the coffee shop and asked defendant if he could speak with him outside. Defendant responded calmly in an amenable manner, and he and the officer left the shop. Defendant volunteered that he had come from the sheriff's department (actually the YCCC), where he had left a box on which he had written "C-4," which he knew was a plastic explosive. He claimed this was a joke, not meant for anyone in particular and not intended to cause anyone *463 harm. However, he mentioned that he knew there were women at the YCCC who had made fun of him, which upset him. He would not be any more specific about these women. He said the box contained only a plastic bag filled with bleach and motor oil.
Another responding officer had seen defendant about 25 minutes before the bomb report at a four-way stop near the YCCC. Defendant had stared at the officer for an extended period of time, looking agitated or angry.
Among defendant's effects at the coffee shop was a disposable camera. He said he photographed various government buildings, bridges, and police officers. There were random writings on the newspaper and on a Watchtower pamphlet; the phrase "Angry 19" was written next to or on a drawing of a box with an antenna; and there were drawings of what appeared to be radio towers. There were also books on the supernatural and parapsychology.
In a search of defendant's apartment, which was directly north of the complex of county buildings, the police found a number of photographs. They also found photographs in the trunk of his car. These were mostly innocuous, but included pictures of the parking area for the district attorney, patrol cars, a university police station, the courthouse, the headquarters of the probation department, and the offices of the county's department of mental health. They did not find any explosives or detonators. They also did not find any manifestos or other angry writings.
A few days before defendant placed the fake bomb, a worker in one of the buildings around the YCCC saw him near his car, which was parked across from the health and social services building. He was pacing back and forth, and making gestures that looked like he was pretending to shoot a rifle at the building. He was someone she had seen around the premises about a dozen times in the nine-month period she had worked there. His actions frightened her. She reported this to the police.
A bomb expert testified that actual bombs frequently do not appear to be bombs. C-4 is an explosive of high strength. The small size of the box did not diminish the possible power of the bomb. The flag could have been an antenna. Only after X-raying the box and not seeing any solid materials or power sources did he feel comfortable about opening it. Only then was he able to confirm that it did not contain an explosive or a detonator.
A psychologist testified about her evaluation of defendant. He had paranoid beliefs that, among other things, the officers at the jail wanted to have sex with him. His thinking in general was fragmented and tangential. In discussing the charges against him, he said he had placed the bomb to scare off *464 women who had been sexually harassing him and wanted to kill him because they "wanted to get rid of all the blacks" as "they're too smart." Defendant had a history of psychiatric treatment for schizophrenia dating back to 1983. In a later interview, he claimed the fake bomb was just a joke, but again alluded to the need to scare off women interested in him. He was aware his attorney was trying to have him found incompetent to stand trial, which upset him because he did not "want to go that route."
Defendant does not raise any issues with respect to the sanity phase of his trial. We therefore omit those facts.

DISCUSSION

I

A. Equal Protection

1
(1) In its other provisions, section 148.1 punishes knowingly false reports of bombs to peace officers or other people as a "wobbler" with imprisonment in state prison or up to a year in jail. (§ 148.1, subds. (a)-(c).) In section 148.1(d), the text of which was added as subdivision (c) in 1972 (see Stats. 1972, ch. 1142, § 1, p. 2210), the statute similarly punishes persons responsible for maliciously placing, sending, or possessing "any false or facsimile bomb, with the intent to cause [others] to fear for [their] personal safety or the safety of others . . . ."
In 1999, concerned with the increasing threat of terrorism that made use of chemical, biological, nuclear, and radiological agents (§ 11416), often with dispersal methods that included explosive devices (§ 11417, subd. (a)), the Legislature enacted a new offense of producing, possessing, or using WMD's (§ 11418). In 2002 the Legislature added section 11418.1 to penalize any person who places, sends, or possesses "any false or facsimile of a [WMD], with the intent to cause [others] to fear for [their] own safety, or for the . . . safety of others," punishable only as a misdemeanor except where this "causes another person to be placed in sustained fear"[3] (in which case the conduct is punished as a wobbler).
In the legislative history for section 11418.1 (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1838 (2001-2002 Reg. Sess.) as amended Mar. *465 7, 2002), of which we have taken judicial notice at defendant's request,[4] the analysis directly poses the question of whether the Legislature should create a new wobbler drawn from section 148.1(d) for placement of false WMD's causing sustained fear, and a misdemeanor when sustained fear is not present. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1838, supra, at pp. 2-3.) According to this analysis, "From discussions with the sponsor of AB 1838, it appears that the new WMD hoax crime was modeled on the bomb threats statute because police and prosecutors are familiar with the existing crime. Further, it was believed that since the conduct in both crimes is similar, the penalties should be similar." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1838, supra, at p. 18, italics added.) In discussing the creation of a new felony in the context of the additional punishment for recidivism, the analysis identified a reluctance to add nonviolent felonies that could be subject to this treatment, but believed the element of sustained fear was equivalent to the harm from violent conduct. (Id. at pp. 19-20.)

2
(2) The constitutional right to equal protection of the law, under either the federal or state charter (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7), is in essence a requirement that all persons similarly situated be treated alike (Niedle v. Workers' Comp. Appeals Bd. (2001) 87 Cal.App.4th 283, 288 [104 Cal.Rptr.2d 534]). Except where a "suspect" class or "fundamental" right is involved (neither of which is at issue in the present case), the legislative classification must bear a "rational" relationship to any legitimate state purpose that a court can posit. (Id. at pp. 288-289.)
(3) Initially, the People contend that defendant has forfeited this issue because he did not raise it initially in the trial court. As defendant correctly points out, where the claim of error does not trample concerns of judicial efficiency, involves only the application of legal principles of law to undisputed facts (without depriving the People of the opportunity to have developed essential facts in opposition), and presents an issue of important public concern (such as the constitutionality of a statute in a case of first impression), we will generally exercise our discretion to allow a party to raise the issue for the first time on appeal. (In re Sheena K. (2007) 40 Cal.4th 875, 887-888 & fn. 7 [55 Cal.Rptr.3d 716, 153 P.3d 282]; In re Spencer S. (2009) 176 Cal.App.4th 1315, 1323 [98 Cal.Rptr.3d 477].) The case before us satisfies these standards, so we will proceed to the merits.

*466 3
The threshold question is whether defendant has shown that "`the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'" (People v. Hofsheier (2006) 37 Cal.4th 1185, 1199 [39 Cal.Rptr.3d 821, 129 P.3d 29] (Hofsheier).) That similar conduct might be punished as different crimes under different statutes does not shield the classification from scrutiny. (Ibid.)
Defendant, as noted, posits that persons convicted under section 148.1(d) and those convicted under section 11418.1 have both placed, sent, or possessed a false object with the intent to cause fear (but without causing sustained fear); the only distinction is the type of objecta false or facsimile bomb under section 148.1, or a false or facsimile WMD under section 11418.1.[5] As in Hofsheier, the conduct is identical except for a variance with respect to the particular form of the conduct. (Hofsheier, supra, 37 Cal.4th at p. 1199 [intercourse and oral copulation are both forms of sexual conduct with a minor].) This is sufficient to trigger our scrutiny of the classification. (Cf. ibid.)
The People argue that there was evidence at trial from which we could conclude that defendant in fact caused sustained fear and therefore is not similarly situated with a misdemeanant violator of section 11418.1, and he therefore lacks standing to assert the claim. This argument is not well taken. The People do not provide any authority for the proposition that in a challenge to the facial constitutionality of the statute we must consider circumstances that are not part of the statutory definition of the crime and that were not the subject of any jury finding. Defendant does not contend there is anything about the particular circumstances of his offense that renders his punishment a constitutional violation as applied to him (such as with claims of cruel and unusual punishment). "We are unconvinced by the People's proposed approach, which would require us to look beyond the statutory elements of the offense [defendant] admitted." (In re J.P. (2009) 170 Cal.App.4th 1292, 1299 [89 Cal.Rptr.3d 17] [rejecting People's argument that minor not similarly situated because facts of case showed he could have been convicted of different crime (that was not an included offense) for which all offenders receive identical treatment]; accord, People v. Ranscht (2009) 173 Cal.App.4th 1369, 1374-1375 [93 Cal.Rptr.3d 800].) We thus do not need to consider defendant's arguments regarding the sufficiency of the evidence to prove sustained fear.

*467 4
(4) The legislative history we have quoted above (see, ante, at p. 465) expressly noted a view that the conduct underlying sections 148.1(d) and 11418.1 was the same and warranted identical punishment. The analysis overlooked, however, the fact that a false WMD offense carries the same wobbler penalty as a false bomb offense only where there is proof of an additional element of sustained fear that justified the creation of a new nonviolent felony subject to additional punishment in the event of recidivism. In light of this, we cannot divine any plausible reason why a conviction for placing a false bomb without causing sustained fear should subject a defendant to a felony conviction under section 148.1(d) but only a misdemeanor conviction under section 11418.1 for a false WMD, given the goals that the Legislature articulated. The fear of a false WMD, given the more far-reaching effects of such devices, would generally be more severe (even in the absence of sustained fear) than only an explosive device whose destructive effects could be more easily evaded, and yet the former incurs the lesser punishment.
The People offer the tenet that courts do not require the Legislature to enact a comprehensive response to a problem and may address it in piecemeal efforts. (Hofsheier, supra, 37 Cal.4th at p. 1205.) However, as in Hofsheier, the "argument does not fit this case." (Id. at p. 1206.) The People have not identified any ongoing legislative examination of nonviolent felonies to determine which address conduct that is properly the subject of additional punishment for recidivism. (Cf. ibid. [no showing of ongoing legislative fine-tuning of registration statute to eliminate distinctions between intercourse and oral copulation with minors].) Moreover, the Legislature first added the text of section 148.1(d) in 1972, and has not modified it since 1991 (when it added possession to the list of acts, and changed the definition from an intent that another person think it is a real bomb to an intent to cause fear); nor has it modified any other part of the statute since 1984, other than to add categories of peace officers to whom a false bomb report is punishable under section 148.1, subdivision (b). (Cf. Stats. 1998, ch. 760, § 1; Stats. 1991, ch. 503, § 1, pp. 2446-2447; Stats. 1984, ch. 824, § 1, pp. 2849-2850.) The 1991 revisit antedates the sea change of harsher treatment of recidivism that began in earnest in 1994 and continues to the present, and thus the rationale for treating the placement of a false bomb without sustained fear as a wobbler has eroded over time, given the legislative history of section 11418.1. (Cf. Hofsheier, supra, 37 Cal.4th at p. 1206 [harsher treatment of oral copulation arose at time when it, unlike intercourse between consenting adults, was illegal].)
Defendant's felony punishment has therefore violated his right to equal protection. This leaves the question of remedy.

*468 5
Without any authority, defendant simply asserts that we must reverse his conviction. We reject this claim. Defendant's conduct is still a crime. It is merely the degree of punishment that violates his right to equal protection.
(5) A court may choose between extending beneficial treatment to the disfavored class or withdrawing it from the favored class. (Hofsheier, supra, 37 Cal.4th at p. 1207.) The primary concern is to ascertain the Legislature's preferred alternative. (Ibid.) As the distinction the Legislature has drawn in section 11418.1 is its most recent explicit consideration of the punishment that a false destructive device merits, and an articulation of its general policy for when a nonviolent crime merits felony treatment, we believe defendant should have the benefit of the lenience that the Legislature has declared with respect to false WMD's that do not cause sustained fear (rather than disregarding the efforts in § 11418.1 to tailor a distinction). We therefore conclude that placing a false bomb within the meaning of section 148.1(d), which does not include the element of causing sustained fear as defined in section 11418.5, is only a misdemeanor.[6] This conclusion does not prevent the Legislature from deciding to add sustained fear as an element of section 148.1(d) or finding some other way of keeping the punishment parallel with section 11418.1 in order to impose the same punishment on both groups of offenders. (Cf. Hofsheier, supra, 37 Cal.4th at p. 1206.)
As a result, the sentence for defendant's violation of section 148.1(d) is now reduced from a minimum indeterminate term in prison of 25 years to life to no more than one year in county jail. We must remand the matter to the trial court to determine the length of his jail term on the present offense and the manner in which it wishes to structure his overall sentence.

B. Due Process[*]

II-IV[*]

*469 DISPOSITION
The judgment of conviction is affirmed. The sentence is vacated, and the matter remanded for sentencing on the violation of section 148.1(d) as a misdemeanor.
Butz, J., and Cantil-Sakauye, J., concurred.
*470 
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts IB, IIA, IIB, III, and IV of the Discussion.
[1] All further statutory references are to the Penal Code.
[2] Although the writing is not legible, we have included a photograph of the box as an appendix to this opinion; the "bomb" itself was an exhibit at trial.
[3] Among the nonexclusive examples in the cross-referenced definition of sustained fear are evacuations of buildings, or isolation, quarantine, or decontamination efforts. (§ 11418.5, subd. (b).)
[4] This is a properly cognizable category of legislative history for purposes of judicial notice. (Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc. (2005) 133 Cal.App.4th 26, 32-35 [34 Cal.Rptr.3d 520].)
[5] As defendant notes, had he written "anthrax" on the box, he would have been guilty of only a misdemeanor.
[6] We do not decide whether the People may seek a special jury finding of sustained fear in order to punish the offense as a felony.
[*] See footnote, ante, page 458.